**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>YAREH E. LUNA-IRIZARRY,<br>Defendant. | CRIMINAL NO. 26-023 (FAB)(HRV) |

## REPORT AND RECOMMENDATION

Pending before the Court is the motion to suppress evidence filed by defendant Yareh Luna-Irizarry (hereinafter "Mr. Luna" or "Defendant"). (Docket No. 28). The United States opposes the motion. (Docket Nos. 42). This matter has been referred to me by the presiding District Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1). (Docket Nos. 30 and 33). I held an evidentiary hearing on September 3, 2026. (Docket No. 53). For the reasons set forth below, I recommend that the motion to suppress be denied.

### I. Procedural Background

On January 22, 2026, the Grand Jury returned an Indictment charging Mr. Luna in one count with possession of a machinegun in violation of 18 U.S.C. § 922(o). (Docket No. 17). The charge stems from a Puerto Rico Police Bureau ("PRPB") traffic intervention with the vehicle driven by Mr. Luna on January 7, 2026. It is alleged that upon

conducting a traffic stop for dark tinted windows, a PRPB agent observed in plain view the tip of a firearm barrel in the rear part of the vehicle's floor under the driver's seat. PRPB agents seized, among other things, a Glock pistol .40 caliber modified to shoot automatically, firearm magazines, and ammunition.

On May 20, 2026, the Defendant filed his motion to suppress claiming in general that suppression is warranted because the Government's plain view theory "cannot survive scrutiny on any level." (Docket No. 28 at 2). According to Mr. Luna, the photographs provided by the Government in discovery undermine any claim that the firearm was visible from any vantage point to an officer standing outside of the vehicle, even with the doors open and the use of a flashlight to conduct the window tint measurement procedure. To bolster his argument, Defendant underscores that body-worn camera videos did not capture the full intervention because agents began to record "only after the search had concluded, the vehicle had already been opened, and Luna-Irizarry was already under police control" in violation of the PRPB body-camera policy. (Id. at 3). The Defendant further argues that PRPB agents conducted a warrantless search of his vehicle in violation of the Fourth Amendment; that compliance with police instructions did not constitute voluntary consent to create a lawful vantage point; and that the traffic stop was unlawfully extended.

The Government filed its response in opposition on June 15, 2026. (Docket No. 42). The United States requested that the motion to suppress be denied without a hearing, contending, first, that Defendant did not meet his threshold burden to show a legitimate expectation of privacy in the vehicle. Second, the Government maintains that, regardless, the PRPB agents conducted a lawful traffic stop for illegal window tints and that they

observed the firearm in plain view from a lawful vantage point as they carried out a proper tint-enforcement procedure. Lastly, the United States argues that failure to activate body-worn cameras does not warrant suppression because the PRPB agent's failure to follow policy did not constitute the type of deliberate, reckless or systemic conduct that triggers the exclusionary rule.

On that same date, June 15, 2026, I ordered the Defendant to respond to the Government's argument regarding lack of standing, warning him that failure to properly substantiate his legitimate expectation of privacy would cause the scope of the hearing to be limited to the lawfulness of the traffic stop. (Docket No. 43). The Defendant complied. (Docket No. 47).

On September 3, 2026, I held an evidentiary hearing. The Defendant testified as to the issue of standing. (Docket No. 53). The Government presented the testimony of PRPB agent Javier Santiago-María ("Agent Santiago"). (Id.). Several exhibits were admitted into evidence. (Id.; see also Docket No. 56). The undersigned also heard closing arguments from counsel.

## II. FINDINGS OF FACT

With the benefit of the parties' written submissions and the documentary and testimonial evidence received at the suppression hearing, I now make the following findings of fact.

### A. Testimony of Mr. Luna

Mr. Luna testified that he is 24 years old and works with a music artist. On January 7, 2026, there was an intervention that gave rise to the present case. That night, he was driving a Honda Pilot. Prior to the PRPB stopping him that night, he had the

Honda Pilot for approximately 8 months. Mr. Luna obtained possession of the Honda Pilot by exchanging it with a friend for another vehicle he had. He needed extra loading/cargo to be able to pull his four-tracks and jet skis. Mr. Luna exchanged a Jeep Cherokee for the Honda Pilot. The exchange of vehicles occurred at his friend's house.

Mr. Luna further testified that from the time he acquired possession of the Honda Pilot until the January 7, 2026, intervention, he was the only person who maintained control of the vehicle. He used it regularly, had the keys, controlled who could use it, and kept personal property in it. Nobody else had keys to the vehicle, and he kept it at his mother's house when he was not using it. During the time that Mr. Luna had the vehicle, the person from whom he acquired it from never demanded it be returned. No one ever told Mr. Luna that the possession of the Honda Pilot was unauthorized. He understood that the person who gave the Honda Pilot to him was authorized to transfer it to him. All documents related to the car, like the license plate and registration sticker (*marbete*) were in order.

On cross-examination, Mr. Luna admitted that he does not know the license plate number, nor the name of the person that exchanged the Honda Pilot with him. In his testimony at the suppression hearing, Mr. Luna identified the person as a friend. However, in his unworn statement under the penalty of perjury submitted to the Court (Docket No. 47-1), Mr. Luna did not say the person was a friend. He stated that the vehicle was transferred to him "through a series of informal exchanges between private individuals." As to the registration documents, Mr. Luna knows the name of his friend but does not know the person the Honda Pilot is registered to. He also does not know if his friend had legitimate possession of the car before it was transferred to him. Mr. Luna

only knows that his friend gave him the keys and only knows the nickname of his friend: "Omi."

Further, when asked if he knew the address of his friend where the exchange occurred, Mr. Luna changed the version and said that the exchange did not take place at the friend's home. Instead, he testified that they met through social media and did the exchange. Mr. Luna had to admit that what he said just minutes before that the exchange took place at the home of his friend was not true. He does not know where Omi lives. Mr. Luna had spent time together with Omi "in the water", a reference to riding jet skis. Omi offered the vehicle to him because he saw that Mr. Luna had a need for a vehicle to transport his jet ski to the beach. Mr. Luna does not know how Omi obtained the Honda Pilot. He has never seen the title, nor a signature of the registered owner transferring title to him. Mr. Luna is unaware what happened to the Jeep Cherokee that he exchanged for the Honda Pilot.

Mr. Luna testified on redirect examination that he did not steal the Honda Pilot or take it without the knowledge of the person that possessed it. Again, he received it as part of an exchange. The Honda Pilot was his personal vehicle and no one told him he was not entitled to possess it. On re-cross, Mr. Luna was asked if he was the registered owner of the vehicle. He is not.

**B. Testimony of Agent Santiago**

Agent Santiago has been a PRPB agent for approximately four (4) years. On January 7, 2026, he was assigned to the Hato Rey zone preventive unit, a unit tasked with crime prevention through patrolling and investigating complaints referred by central command. At the time, Agent Santiago had been in that unit for approximately

one month. Before that, he was assigned to the Hato Rey East precinct also in the preventive unit. Agent Santiago has worked as a preventive unit agent for approximately three (3) years.

On January 7, 2026, at around 9:45 p.m., Agent Santiago was on preventive round on Santiago Iglesia Street in Puerto Nuevo. He observed a grey Honda Pilot with dark windows in violation to Law 22, P.R. Laws Ann. tit. 9 § 5001 *et seq*. Agent Santiago could not see the driver or any other occupant of the vehicle. Based on his training and experience, the agent was able to determine that the window tints were in violation of article 10.05 of Law 22.[1] Upon observing this, Agent Santiago activated the blue lights and siren of his marked police unit. The driver did not immediately stop, but pulled over further ahead, on Santiago Iglesia Street in front of house 1380. Through the speaker, Agent Santiago ordered the driver to lower the windows of the vehicle and to place the vehicle in parking. He ordered the windows to be lowered for safety reasons because they were dark and the agents could not see inside. Agent Rodney López ("Agent López") was patrolling with him that day.

Agent Santiago immediately exited the patrol car and approached the driver's side of the Honda Pilot. Once there, the agent told the driver the reason for the stop, a violation of article 10.05, and asked for license and registration. The driver only produced the vehicle registration but verbally provided his driver's license number.

[1] Article 10.05 of the Puerto Rico Traffic Law (Act 22 of January 7, 2000) prohibits the use of one-way glass for the windshield and glass windows of vehicles or motor vehicles, as well as the altering thereof by applying tints and any other material or product used as a solar filter on the windshield and windows of motor vehicles to produce a percentage of transmission of visible light of less than thirty-five percent (35%). P.R. Laws Ann. tit. 9 § 5285.

During this initial exchange, the driver was still seated in the driver's seat inside the vehicle. Only the driver's window was down. Agent Santiago then ordered the driver to roll down the rest of the windows and proceeded to explain to the driver the window tint test procedure. As the agent was conducting the test, the driver was asked to step out the vehicle to observe the procedure as required by General Order 643. *See* Government's Exhibits 7 and 7-A.

The window tint test involves using a device called photometer that, after being calibrated to make sure it is working, is placed in the middle of a car window from the inside. On the driver's side window of the Honda Pilot, the test resulted in a 20% visibility, well below what article 10.05 allows. After testing the driver's window, agent Santiago went to the driver's side rear door window. Agent Santiago ordered the driver to open the door, and the driver complied. The agent placed the photometer on the window and told the driver to observe the result of the test. As Agent Santiago was standing next to the vehicle with the door open, and using his flashlight, he was able to observe in plain view what he identified as the barrel of a firearm. The firearm was located underneath the driver's seat. The driver was standing to the front left of the agent when the observation was made.[2]

Government's Exhibit 2 is a photograph of the firearm underneath the seat as was allegedly observed by agent Santiago on January 7, 2026. Agent Santiago was asked to

---

[2] A drawing of a car in which the agent marked with an X where he was standing, and with a triangle where the driver stood when the observation was made, was admitted into evidence as Government's Exhibit 8.

draw a circle where the firearm barrel can be seen. A printout of the image was admitted as Government's Exhibit 2-A. Government's Exhibit 3 is a zoomed in version of the photograph. The photographs are inserted below:



Gov't Exh. 2.



Gov't Exh. 2-A



Gov't Exh. 3

After Agent Santiago made the critical observation, he went to the passenger side of the vehicle where Agent López was standing. The driver followed him. At that moment, and for safety reasons, Agent Santiago decided not to tell the driver what he had observed but did make the sign of a firearm trigger with his hand, a signal that his fellow officer immediately understood. After this, Agent López remained close to Agent Santiago and the driver. Agent Santiago then performed the window tint test on the passenger's side of the vehicle in the presence of the driver. The PRPB general order requires that all windows be tested. (Government's Exhibits 7 and 7-A).

Thereafter, Agent López remained with the driver, and Agent Santiago went to the patrol car to corroborate information and to turn his body camera on. Agent Santiago testified that he did not activate the body camera at the beginning of the intervention because he got out of his patrol car quickly and due to involuntary forgetfulness. From

that point forward, the rest of the intervention was captured in video and recorded. Agent Santiago identified Mr. Luna in open court as the driver he intervened with that night.

Government's Exhibits 1 and 1-A (the certified English translation of the audio) are the relevant and stipulated clips of the video footage from Agent Santiago's body camera. Clip 1 of Government's Exhibit 1 begins with Agent Santiago reading Miranda warnings to the Defendant, asking if he has a firearms license[3], and informing him of the presence of the firearm inside the vehicle. Mr. Luna exercised his right not to answer questions without the presence of an attorney. Clip 2 depicts Agent Santiago showing Mr. Luna where the firearm was located underneath the driver's seat in plain view. Clip 3 shows in pertinent part Mr. Luna alleging that the firearm cannot be seen in plain view and claiming that the agents had no right to order him out of the vehicle. Clip 4 depicts personnel from technical services taking photographs at the scene. At second 55, Agent Santiago testified that such was approximately the angle from where he initially saw the barrel of the firearm in plain view. The agent also testified that the light that appears shining in that portion of the video comes from his flashlight.

The body camera of Agent Santiago was located toward the lower part of his chest, in the thorax area. As the video continues, the person from technical services is taking photographs, including the area where the barrel of the firearm can be seen, and Agent Santiago is informing Mr. Luna that the inventory of the vehicle will be conducted at the

[3] Agent Santiago already knew, based on an inquiry into the police database, that Mr. Luna did not have a firearms permit.

precinct. In this clip, Agent Santiago can be heard indicating to the technical services person that he did not have to squat or bend over to be able to see the firearm.

Clip 5 of Exhibit 1 documents the window tint testing procedure revealing the results of the test, in percentages that are below what is allowed by law. It also shows the closing of the windows and doors as well as Agent Santiago's seizing, clearing and bagging the firearm, which was loaded. The agent is heard mentioning in the video the presence of a fanny pack, which according to him, will be verified during the inventory process at the precinct. The firearm is black, and the interior of the vehicle "looked" gray. Agent Santiago testified that he was able to see the firearm using his flashlight and because his vision is "100 percent." He identified it as such based on his experience.

During cross-examination, Agent Santiago stated that the area he was patrolling on January 7, 2026, in Puerto Nuevo, is a residential neighborhood. Prior to the traffic stop, the agent did not have any report that the Honda Pilot contained firearms or drugs. The agent followed the vehicle only seconds before ordering it to stop. Based on his experience, the agent knew that the tints were in violation of article 10.05. Agent Santiago once again stated that he asked Mr. Luna to get out of the vehicle to conduct the photometer test. Upon testing the first window, on the driver's side, the test showed that it was unlawful. In fact, all windows were unlawfully tinted. However, the agent issued a single ticket for the whole vehicle. When asked on cross why he tested all windows if he already knew he was going to issue a ticket, Agent Santiago reiterated that General Order 643 requires that all windows be tested.

Recognizing that it is important to follow the PRPB general orders, Agent Santiago was confronted with the fact that he did not follow the general order governing the use

of body worn cameras which requires that they be activated from the inception of a traffic stop. The body cameras have a 30-second buffer, that is, once activated, the previous 30 seconds are recorded. Agent Santiago acknowledged that he did not activate the body cameras during the initial approach to the vehicle, nor when he began talking to Mr. Luna. The cameras were off when Mr. Luna was ordered out of the vehicle to observe the photometer testing as well as when Agent Santiago allegedly observed the gun in plain view. Agent Santiago admitted that, while he followed the window testing protocol, he did not follow the body-camera regulations. Agent Santiago explained, however, that the camera does not replace what he can perceive or observe personally as the regulation itself establishes.[4]

Defense counsel confronted Agent Santiago with the fact that on direct examination, he did not mention that he had observed a fanny pack on the floorboard of the driver's seat. The agent responded that he did not mention it, but he had in fact seen it upon testing the first window. The fanny pack was not underneath the seat. Agent Santiago was shown Defendant's Exhibit A, a photograph taken by technical services personnel, but he could not initially tell if the photograph was taken at the scene or at the precinct. Defense counsel then showed Agent Santiago a photograph later admitted into evidence as Defendant's Exhibit C. He was able to recognize the photograph as having been taken at the scene, but when asked where the fanny pack was, he said it

---

[4] The PRPB regulations governing the use of body-worn cameras provides in relevant part that: "The NPPR recognizes that cameras do not capture exactly what an MNPPR observed or heard, or what the MNPPR felt or experienced during an intervention." Defendant's Exhibit B; see also Docket No. 28-2 at 5.

could not be seen from the angle of the photograph. The agent later acknowledged, using Exhibit C as reference, that Defendant's Exhibit A (inserted below) was also taken at the scene. He insisted, however, that the fanny pack can't be seen in the photograph because of the angle. Agent Santiago denied that he had to "look for it" to see the fanny pack.



Def't. Exh. A.

Counsel for the Defendant also confronted Agent Santiago with his incident report, particularly section K, titled "Search and Seizure." That section was left blank, including the box for "plain view." Over the Government's objection, I admitted the police report as Exhibit D and gave the Defendant 10 days to provide a certified English translation.[5]

[5] The Defendant failed to submit the English translation within the deadline provided. Accordingly, Exhibit D is stricken from the record and shall not be considered by the undersigned. *United States v. Roman-Huertas*, 848 F.3d 72, 75-76 (1st Cir. 2017) (quoting 48 U.S.C. § 864) ("The Jones Act requires that '[a]ll pleadings and proceedings in the United States District Court for the District of Puerto Rico . . . be conducted in the English language.'").

Still on cross, Agent Santiago related that when he moved to the rear door of the driver's side, Mr. Luna was already out of the vehicle. Agent Santiago asked Mr. Luna to open the rear driver's side door. The agent denied that Mr. Luna objected to stepping out of the vehicle and added that he was compliant with instructions, "in the beginning." Mr. Luna did not object to opening the back door either. Agent Santiago testified that his patrol car was parked behind the Honda Pilot with its headlights on. Agent Santiago denied that he used his flashlight to illuminate inside the vehicle; he used it only to illuminate the window testing. He also denied that a yellow towel partially blocked the view or that he had to bend forward, crouch, or lower his head to see the firearm. The flashlight was trained at the photometer when he saw the gun for the first time.

Further, when asked about why he did not conduct a full search of the car at the scene after the firearm was observed, Agent Santiago cited safety reasons. He had already seen the fanny pack but did not know what it contained. The agent denied that he opened the fanny pack at the scene. The ticket for the window tint violation was given to Mr. Luna at the precinct. When asked if he could have issued the ticket after testing the first window given that it was non-complaint, Agent Santiago answered in the negative because protocol requires that all windows be tested.

On redirect examination, counsel for the Government addressed the matter of the fanny pack not being visible in Defendant's Exhibit A. Agent Santiago reiterated that it could not be seen due to the angle. Counsel for the Government then played Clip 5 of Exhibit 1. At minute 4:55, and from that angle, the fanny pack can be seen. On Re-cross, Agent Santiago was shown Clip 5, where he is seeing retrieving the firearm. Agent Santiago denied that he pulled anything from under the seat other than the firearm.

## III. Applicable Law and Discussion

At the conclusion of the suppression hearing, the parties were in agreement that, distilled to its essence, the question before the Court is whether the testimony of agent Santiago—that he observed the tip of the barrel of a firearm in plain view underneath the driver's seat of the Honda Pilot—deserves credibility. Defendant does not dispute that the traffic stop was lawful at inception. He argues, however, that the traffic stop was unlawfully extended and that the court should not believe the unrecorded version of Agent Santiago that he was able to see in plain view the barrel of a black firearm, at night, in a dark vehicle with dark upholstery. As per Mr. Luna, the only way that the agent could have seen the firearm is by conducting a warrantless "search" without probable cause. At the hearing, Mr. Luna continued to highlight the issue of failure to activate the body cameras as a corollary to his claim that the testimony of Agent Santiago should be looked at with suspicion.

The Government responds by claiming, first, that Mr. Luna did not meet his burden to establish that he has standing to challenge any search of the vehicle. With respect to the plain view observation, the United States maintains that the agent could see the firearm from the lawful vantage point of the window tint testing, with minimal effort. Recognizing that the agent's forgetting to activate the body camera at the beginning of the traffic stop is problematic, the Government nevertheless contends that there is no claim made by the defense that the firearm was moved or manipulated to make it visible. Therefore, the only way to know that it was there was to see it in plain view. According to the Government, human vision is not static, and the body camera,

even if it had been activated at the outset, would not have captured everything that was observed and perceived by Agent Santiago.

### A. Standard of Review – Warrantless Searches and Seizures

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend IV. A criminal defendant seeking to suppress evidence bears a threshold burden of showing that a Fourth Amendment violation occurred, which in turn encompasses the burden of establishing that he or she was subjected to a warrantless search or seizure. *See United States v. Young*, 835 F.3d 13, 19 (1st Cir. 2016); *see also United States v. Fields*, 823 F.3d 20, 25 (1st Cir. 2016). Once the defendant establishes that a warrantless search or seizure occurred, the burden shifts to the government to prove by a preponderance of the evidence that said search or seizure was lawful. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *United States v. Delgado-Perez*, 867 F.3d 244, 250 (1st Cir. 2017).

### B. Standing

When moving to suppress evidence, a defendant "carries the burden of establishing that he had a reasonable expectation of privacy with respect to the area searched or . . . the items seized." *United States v. Lipscomb*, 539 F.3d 32, 35-36 (1st Cir. 2008) (citing *United States v. Salvucci*, 448 U.S. 83, 91-92 (1980)). This threshold standing requirement is something that a defendant must establish before the court engages in any substantive Fourth Amendment analysis. *United States v. Lewis*, 40 F.3d 1325, 1333 (1st Cir. 1994). To carry this burden,

> a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; i.e., one that has a source outside of

> the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.

*United States v. Samboy*, 433 F.3d 154, 161 (1st Cir. 2005) (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)).

Put differently, the court must determine "whether or not the individual thought of the place (or the article) as a private one, and treated it as such" and "whether the individual's expectation of confidentiality was justifiable under the circumstances." *United States v. Aguirre*, 839 F.3d 854, 857 (1st Cir. 1988). The following factors are relevant to the inquiry: "ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; [and] the totality of the surrounding circumstances." *Id.* at 856-57; *see also United States v. Almeida*, 748 F.3d 41, 47 (1st Cir. 2014) ("In the context of a vehicle search, a defendant must show 'a property [or] possessory interest in the automobile' in order to establish a reasonable expectation of privacy.").

Here, the testimony of Mr. Luna regarding how he obtained possession of the Honda Pilot was vague at best, unbelievable at worst. He allegedly obtained the Honda Pilot via exchange with a friend he only knows as Omi. He met Omi "in the water." Defendant does not know how Omi obtained possession of the car. He also does not know the person that appears as the registered owner of the vehicle. Mr. Luna's claim that he has shown a legitimate expectation of privacy is solely based on his self-serving testimony that he had possession the vehicle (he had the keys), used it regularly, had the right to exclude others, kept personal property in it, and no one demanded that he give the vehicle back. This is insufficient, in the undersigned's view, to show standing on a

theory of lawful possession and control of the vehicle. *See United States v. Morales-Torres*, No. 14-cr-215 (GAG), 2017 U.S. Dist. LEXIS 57131, 2017 WL 1373329 (D.P.R. Mar. 14, 2017) (finding defendant failed to meet his burden to show standing by presenting his own self-serving testimony that he owned the car for four (4) or five (5) months after he bought the car's account for $4,000 from "a lady" he met at the parking lot of a shopping mall); *see also United States v. Hernández-Marin*, No. 19-cr-133 (DRD), 2020 U.S. Dist. LEXIS 81803, at *16-17, 2020 WL 2297146 (D.P.R. May 7, 2020) (finding that testimony that defendant was owner of a car because he bought it on the internet from an unknown person and had the keys insufficient to meet the burden to show standing). What's more, a person that cannot show he or she is in lawful possession of a vehicle, fails to establish standing the same way a car thief would not have a legitimate expectation of privacy in a stolen car "[n]o matter the degree of possession and control." *Byrd v. United States*, 584 U.S. 395, 409 (2018).

In any case, even assuming *arguendo* that Mr. Luna met his burden to show standing, the outcome is the same. In the context of automobiles, establishing a legitimate expectation of privacy is a threshold requirement to challenge a search of the vehicle. In this case, I find that the Government has proven that the firearm at issue was observed in plain view. The agent did not conduct a search of the vehicle to detect the firearm. *See United States v. Vicente-Lucas*, 826 F. Supp. 2d 422, 428 (D.P.R. 2011) ("It is well settled that a police officer's observation of an item in plain view does not constitute a search so long as the officer makes his observation from a lawful vantage point."). Thus, even if Mr. Luna had a legitimate expectation of privacy in the Honda Pilot, his Fourth Amendment rights were not violated as further discussed below. *See*

*United States v. Santiago-Ramos*, 991 F. Supp. 2d 318, 323 (D.P.R. 2014) (holding that defendant failed to show standing but that suppression would be denied even if he had because the Court found credible the law enforcement version that, upon a traffic stop for a window tint violation, contraband was observed in plain view).

Lastly, and to be sure, it is uncontested that Mr. Luna has standing to challenge the lawfulness of the traffic stop conducted by the PRPB officers. For instance, in *United States v. Stark*, 769 F.3d 83 (1st Cir. 2014), the First Circuit reversed the denial of a motion to suppress on standing grounds. The district court had ruled that Stark lacked standing to challenge the traffic stop and the search of the vehicle that ensued after he was detained, because he was unlicensed, the car was a rental, and he was not authorized to drive it. *Id.* at 89. The First Circuit disagreed, reasoning that, pursuant to *Brendlin v. California*, 551 U.S. 249, 251 (2007), Stark was seized within the meaning of the Fourth Amendment when the police conducted a traffic stop and thus had standing to challenge the constitutionality of said stop. *Id.*; *see also United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000) (explaining that a defendant lacking the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention.). Therefore, the undersigned briefly analyzes the lawfulness of Mr. Luna's seizure through the traffic stop.

**C. The Traffic Stop**

There is no question that a seizure occurs "when a police officer 'has in some way restrained the liberty of a citizen' through 'physical force or show of authority.'" *United States v. Camacho*, 661 F.3d 718, 725 (1st Cir. 2011) (quoting *Terry v. Ohio*, 392 U.S. 1,

19 n.16 (1968)). And, for several decades now, the Supreme Court has held that the stop of a motor vehicle due to a traffic violation constitutes a Fourth Amendment seizure. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). As such, said seizure must be supported by reasonable suspicion that a traffic violation was committed. *United States v. Chaney*, 584 F.3d 20, 24 (1st Cir. 2009) (citing *Brendlin v. California*, 551 U.S. at 255). "When an unconstitutional seizure occurs, courts enforce the Fourth Amendment's proscription by excluding evidence obtained during said seizure." *United States v. Howard*, 66 F.4th 33, 41 (1st Cir. 2023) (citing *Camacho*, 661 F.3d at 724).

Moreover, once a police officer stops a vehicle, "the tolerable duration of police inquiries . . . is determined by the seizure's mission--to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodríguez v. United States*, 575 U.S. 348, 353 (2015) (cleaned up). In carrying out the mission of the stop, an officer is permitted to undertake those "ordinary inquiries incident to [the traffic] stop." *Id.* at 355 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). Valid inquiries include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (*citing Delaware v. Prouse*, 440 U.S. at 658-660). "Authority for the seizure thus ends when the tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354 (citing *United States v. Sharpe*, 470 U.S. 675, 685 (1985)). Put differently, "[t]he seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" *Id.* at 355 (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)).

Indeed, the actions undertaken by an officer pursuant to a traffic stop "must be reasonably related in scope to the stop itself 'unless the police have a basis for expanding their investigation.'" *United States v. Ruidiaz*, 529 F.3d 25, 29 (1st Cir. 2008) (quoting *United States v. Henderson*, 463 F.3d 27, 45 (1st Cir. 2006)). In other words, "while an officer's actions must bear some relation to the purpose of the original stop, [officers may shift their] focus and increase the scope of [the] investigation by degrees if [their] suspicions mount during the course of the detention." *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001).

In this case, the defendant does not contest the legality of the traffic stop. The evidence presented during the suppression hearing established that the PRPB officers had a well-founded suspicion that the Honda Pilot's windows were tinted in violation of Puerto Rico law. The suspicion was corroborated when Agent Santiago conducted the photometer analysis which revealed that all windows tested in percentages of visible transmission of light below the limits allowed by article 10.05 of Act 22, P.R. Laws Ann. tit. 9 § 5285. On this score, the First Circuit has held that a traffic stop initiated by a police officer based on his or her training and experience that the vehicle has unlawful tinted windows is supported by reasonable suspicion. *See United States v. Maldonado-Peña*, 4 F.4th 1, 23 (1st Cir. 2021). And following the traffic stop, the officer can order those inside the vehicle to get out. *Id.*

To the extent that Defendant continues to press the argument that the traffic stop was unlawfully extended, I find any such argument to be without merit. The officers' actions, first on conducting the window tint protocol, and in asking Mr. Luna to step out of the vehicle to observe the same, were reasonable under the circumstances. In fact, said

procedure followed PRPB window tint measurement regulations. What occurred afterwards, following the plain view observation of a firearm, was responsive to the events as they unfolded. *See Chhien*, 266 F.3d at 6 (explaining that in the traffic stop context, the reasonable suspicion analysis includes a determination of whether the officer's actions "were fairly responsive to the emerging tableau.").

During closing argument at the evidentiary hearing, and answering questions posed by the undersigned, counsel for the Defendant suggested that the agent could have issued a ticket and sent Mr. Luna on his way after he tested the first window. Counsel candidly recognized, however, that the regulations do require that all windows be tested. As fully discussed below, the firearm was observed in plain view very shortly after the lawful traffic stop was initiated. At that point, the police had probable cause to arrest the Defendant for a firearms offense. *United States v. Sánchez-Maysonet*, No. 18-cr-792 (ADC), 2020 WL 13960183, 2020 U.S. Dist. LEXIS 273307, at *24-25 (D.P.R. Feb. 26, 2020) ("The plain view exception permitted the officers to seize the firearm as [the officer] had probable cause to believe that a violation of the Puerto Rico Weapons Act had been committed."). It is thus easy to conclude that the traffic stop, undisputedly lawful at its inception, was not unconstitutionally extended.

**D. Plain View Doctrine**

As noted, the critical question is whether the seized firearm was in plain view. Mr. Luna urges the undersigned to find that it was not from the vantage point of Agent Santiago; that a search had to be conducted, which entailed crouching, bending over, and purposefully shining the flashlight inside the vehicle, for the firearm to be observable. Mr. Luna also contends that Agent Santiago's narrative that he saw the gun in plain view

deserves no credibility due to his failure to activate his body worn camera in violation of PRPB regulations.

Warrantless searches and seizures are *per se* unreasonable unless they fall within one of the "few specifically established and well-delineated exceptions" to the Fourth Amendment warrant requirement. *Katz v. United States,* 389 U.S. 347, 357 (1967). The plain view doctrine is one of the recognized exceptions. *See Coolidge v. New Hampshire*, 403 U.S. 443, 468 (1971). As originally conceived by the Supreme Court, in addition to requiring that an officer lawfully and properly be in a position where he or she can view a particular area and that it be "immediately apparent" that the items observed are evidence of a crime, contraband or otherwise subject to seizure, the plain view doctrine required that incriminating evidence be discovered "inadvertently." *Texas v. Brown*, 460 U.S. 730, 737, 103 (1983) (discussing the elements of the plain view doctrine as set forth in *Coolidge*). The Supreme Court subsequently clarified that "even though inadvertence is a characteristic of most legitimate 'plain view' seizures, it is not a necessary condition." *Horton v. California*, 496 U.S. 128, 130 (1990). Thus, inadvertence no longer being a requirement, the plain view doctrine simply "permits the warrantless seizure of an item if the officer is lawfully present in a position from which the item is clearly visible, there is probable cause to seize the item, and the officer has a lawful right of access to the item itself." *United States v. Gamache*, 792 F.3d 194, 199 (1st Cir. 2015).

"The first element of the test is straightforward and easy to apply." *United States v. Badillo-Hernández*, No. 24-cr-148 (ADC), 2025 WL 1906755, 2025 U.S. Dist. LEXIS 132593, at * 14 (July 10, 2015) (López-Soler, M.J.). The initial warrantless intrusion must be lawful under the Fourth Amendment so that an officer can be said to have lawfully

arrived at the place from which he or she plainly could view the seized object. *United States v. Jones*, 187 F.3d 210, 219 (1st Cir. 1999) (citations omitted). The object, in turn, must be "easily visible to the naked eye." *United States v. Sánchez*, 612 F.3d 1, 5 (1st Cir. 2010).

The second element is satisfied when the incriminating character of the evidence is immediately apparent to the officer, that is, there is probable cause to believe it is evidence of criminal activity. *United States v. Hammie*, 165 F.3d 80, 83 (1st Cir. 1999). On the other hand, the incriminating character of the item is not immediately apparent "if the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). But the First Circuit has cautioned that "[t]he officer need not be certain of the incriminating character of an object, but, rather, must have a belief based on a 'practical nontechnical probability' that the object is evidence of a crime." *United States v. Paneto*, 661 F.3d 709, 714 (1st Cir. 2011).

As to the third element—lawful right to access the item itself—the court must ask not whether the officer was lawfully in a position to see the contraband, which is the first element of the test; rather, whether the officer "could lawfully seize it without committing a trespass." *United States v. Allen*, 573 F.3d 42, 51 n.4 (1st Cir. 2009); *see also United States v. Keleher*, 516 F. Supp. 3d 162, 168 (D.P.R. 2021) (Besosa, J.) (seizure of emails did not constitute a trespass because they were already in the government's possession.).

As noted above, the uncontested evidence presented at the suppression hearing established, as to the first element of the plain view exception, that the PRPB agents lawfully conducted a traffic stop of the Honda Pilot because it had dark tinted windows.

I find that, in following the tint testing protocol, Agent Santiago arrived and lawfully positioned himself at a place from where he could plainly see the firearm. His testimony was that when he shined his flashlight during the tint procedure for the rear driver's side window, he saw the firearm barrel in plain view. *See United States v. Rivera-Melecio*, No. 16-cr-198 (GAG), 2018 WL 6567955, 2018 U.S. Dist. LEXIS 203566, at*27 (D.P.R. June 13, 2018) (finding that the police officer was in a position to make the plain view observation of a firearm inside a vehicle where, similar to this case, the officer "was performing the windows' tints test with the photometer and the door of the vehicle had been opened by Defendant."). Mr. Luna challenges this assertion, arguing that even from that lawful vantage point, the firearm was not visible to the naked eye and that the agent had to search for it. I am unconvinced.

I find credible the testimony of Agent Santiago that he saw the tip of the gun from the angle where he was standing as he conducted the window tint test. Although the intervention occurred at night, the agent was using his flashlight[6], and the headlights of the patrol car provided additional illumination. The videos and photographs introduced into evidence confirm that the observation was not only possible, but likely to be made by anyone standing in the same position and under the same circumstances. Other than a claim that the agent's testimony should be taken with suspicion because he forgot to activate his body-worn camera, the Defendant has not presented any evidence showing

---

[6] Agent Santiago denied that he shined his flashlight directly inside the vehicle's passenger compartment. Nonetheless, there would have been no Fourth Amendment violation if he had done so. *Texas v. Brown*, 460 U.S at 739-40 (holding that the action of shining a flashlight to illuminate the interior of a car "trenched upon no right secured" by the Fourth Amendment.); s*ee also United States v. Bell*, 197 Fed. Appx. 11, 14 n.1 (1st Cir. 2006).

that the agent had any motivation to lie. For example, there is no evidence that the agents had any information prior to the intervention that the driver of the Honda Pilot was armed. As such, there is nothing in the record suggesting that the agents specifically targeted Mr. Luna. After all, these agents were assigned to a preventive unit. Moreover, as the Government correctly pointed out, there is nothing showing that the firearm at issue was moved or manipulated in order to somehow stage the plain view observation. Agent Santiago testified consistently and confidently, admitting when confronted that he followed the window tint test protocol but not the body cam protocol.

Now, as to the issue of the failure to activate the body-worn camera, it is worth noting that I do not take lightly the fact that due to his "involuntary forgetfulness", the court is placed in the position to have accept Agent Santiago's word of what transpired, as opposed to having an evidentiary source that is objective, accurate, and not subject to a credibility attack. *See United States v. Gibson*, 366 F. Supp. 3d 14, 26-27 (D.D.C. 2018) (concluding that failure to activate body-worn cameras in contravention of police department policy "deprived the Court from reviewing the best evidence available."). Some courts have held that failure to activate does not, by itself, support a finding of bad faith in the context of due process, while others have held that it can be a factor in assessing credibility, particularly in a close case. *See United States v. García*, 554 F. Supp. 3d 421, 431 (E.D.N.Y. 2021) (collecting cases). I do not find that Agent Santiago acted in bad faith or with a nefarious purpose when he failed to activate his body camera. *See United States v. Brown*, No. 17-CR-58, 2018 U.S. Dist. LEXIS 6412, 2018 WL 451556, at *3 (D. Nev. Jan 16, 2018) ("Here, the fact that the officers failed to adequately record the events using their [body cameras] is more indicative of negligence than of bad faith").

Simply, the facts and circumstances of this case "suggest[] no more than mere inadvertence." *United States v. Croom*, No. 24-cr-00199-ACA-SGC, 2024 U.S. Dist. LEXIS 231419, at *17, 2024 WL 5194839 (N.D. Ala. Dec. 2, 2024) (disagreeing that the failure to activate his body worn camera called into question the credibility of the testimony given by an officer who testified he was "not the best at remembering to activate [his] body camera.").

Lastly, as to the second and third elements of the plain view analysis, which are not contested by the Defendant, there is no doubt that the incriminating character of the firearm was apparent given that Mr. Luna does not have a permit to carry firearms. Therefore, the agents had probable cause to seize it. Furthermore, Agent Santiago did not have to commit a trespass to seize the pistol. *United States v. Badillo-Hernández*, 2025 U.S. Dist. LEXIS 132593, at *18 ("Upon seeing the firearm and protruding magazine in plain view, having knowledge that Defendant was legally prohibited from possessing a firearm, and considering Defendant's admission that he did not have a weapons permit, [the police officer] had probable cause to believe that Defendant's car contained evidence of a crime.").[7] Suppression is not warranted.

## IV. CONCLUSION

In view of all the above, I recommend that Mr. Luna's motions to suppress (Docket No. 28) be DENIED.

---

[7] Given my findings regarding the lawfulness of the traffic stop and of the seizure of the firearm in plain view, any evidence discovered during the subsequent inventory search of the vehicle at the precinct would not be excluded as fruits of the poisonous tree even if Mr. Luna had standing to challenge any such search.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within 14 days**. Failure to file timely and specific objections is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico this 8th day of October, 2026.

S/Héctor L. Ramos-Vega
HÉCTOR L. RAMOS-VEGA
UNITED STATES MAGISTRATE JUDGE